IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

OPES CAPITAL FUND I, LP, et al.,

Plaintiffs,

v.

EVOLUTION SPORTS LLC, f/k/a
Revolution Sports Agency LLC, et al.,

Defendants.

CIVIL ACTION FILE
NO. 1:22-CV-3823-TWT

## OPINION AND ORDER

This is an action for breach of contract to enforce a settlement agreement. It is before the Court on the Plaintiffs' Motion to Dismiss Defendants' Counterclaims [Doc. 25]. For the reasons set forth below, the Plaintiffs' Motion to Dismiss Defendants' Counterclaims [Doc. 25] is GRANTED in part and DENIED in part. The Court GRANTS the Defendants leave to amend their counterclaims within 14 days of the date of this Order to correct the pleading deficiencies identified herein.

## I.  Background

This case arises out of an alleged agreement to settle a demand for repayment of a series of short-term loans. Defendant Damarius Bilbo is a sports agent who specializes in representing NFL football players. (Answer & Counterclaims ("Answer") ¶ 23.) Bilbo's agency, Defendant Evolution Sports LLC f/k/a Revolution Sports Agency LLC ("Revolution"),[1] operated from 2016

---

[1] Bilbo and Revolution are referred to collectively as the "Revolution

until it was acquired by a larger agency in January 2020. (*Id.* ¶¶ 24, 88.) In 2016, Bilbo was introduced to Plaintiffs Glen Wright II and Worth Financial Tax Services, LLC d/b/a Worth Advisors ("Worth Advisors"),[2] who sought to assist Bilbo with Revolution's financial matters such as insurance, taxes, accounting, and operating capital requirements. (*Id.* ¶ 26.) In June 2017, on Wright's recommendation, Bilbo engaged Plaintiff Charles Horton Jr. as an independent contractor to serve as Revolution's chief operating officer. (*Id.* ¶¶ 28, 31-32.) Although Wright knew and highly recommended Horton, he assured Bilbo that Horton did not work for Wright or Worth Advisors. (*Id.* ¶¶ 29-30.)

As COO, Horton handled nearly all financial aspects of Revolution's business, including bookkeeping, accounting, payment of expenses, billing, taxes, and assessing potential acquisition opportunities. (*Id.* ¶ 33.) Horton also had access to and managed Revolution's bank accounts, credit cards, books and records, and loans. (*Id.* ¶ 34.) Wright and Horton advised Bilbo to seek financing from a private lender rather than a traditional lender to provide more flexible lending terms and lower interest rates and fees. (*Id.* ¶ 37.) In February 2017, Wright recommended that Bilbo enter into a line of credit with

---

Parties."

[2] Worth Advisors and Plaintiff Worth Financial Insurance Services, LLC are referred to collectively as the "Worth Entities."

Plaintiff Opes Capital Fund I, LP ("Opes").[3] (*Id.* ¶ 39.) Upon information and belief, Wright had formed Opes one month earlier so that he could lend money to Bilbo's business. (*Id.* ¶ 38.) Wright, Horton, and Opes never disclosed to Bilbo that they were affiliated with one another. (*Id.* ¶¶ 41-43, 50-52.)

On February 24, 2017, Bilbo, Inc.—a corporation formed to hold Bilbo's interest in Revolution—entered into a loan agreement with Opes for $35,000; the loan bore an interest rate of 16 percent and had a maturity date of August 4, 2017. (*Id.* ¶¶ 44-45.) In March 2017, after Wright and Horton recommended that Bilbo increase his financing with Opes, Bilbo, Inc. entered into a second loan agreement with Opes for $295,000; this loan bore an interest rate of 52 percent and had a maturity date of August 4, 2017. (*Id.* ¶¶ 48, 54-55.) Bilbo, Inc. only received $45,000 from Opes upon execution of the March 2017 loan; however, Bilbo, Inc. was induced to sign a promissory note in the amount of $295,000, and Bilbo was induced to sign a confession of judgment in the same amount. (*Id.* ¶ 58.) Although the February 2017 loan bore a much lower interest rate, it was purportedly rolled into the March 2017 loan with an interest rate of 52 percent. (*Id.* ¶ 59.)

In mid-2017, Wright obtained a new corporate credit card for Revolution. (*Id.* ¶ 60.) He and Horton, who managed the credit card, began using Opes funds to make Revolution's monthly payments and recorded the

---

[3] The Plaintiffs are referred to collectively as the "Opes Parties."

3

payments as "advances" to Revolution under the March 2017 loan. (*Id.* ¶ 63.) This allowed Opes to accrue 52-percent interest on the credit card payments. (*Id.*) Wright, Horton, and Opes did not inform Bilbo that they were engaged in this practice. (*Id.*) When Bilbo asked about the credit card payments in November 2017, Wright responded, "I didn't tell you, the way we are doing things with expenses going through the corp will help u tax wise also." (*Id.* ¶ 64.) The Opes Parties have never been able to provide the Revolution Parties with records documenting the alleged credit card advances. (*Id.* ¶ 65.)

In November 2017, Wright and Horton again advised Bilbo to increase his financing with Opes, although Bilbo told them that he did not need additional capital for his business. (*Id.* ¶ 66.) Even so, on November 21, 2017, Bilbo, Inc. purportedly entered into a loan agreement with Opes for $650,000; the loan accrued interest at a rate of 30.76 percent and had a maturity date of February 23, 2018. (*Id.* ¶¶ 71, 73.) Bilbo does not recall seeing or signing any documentation related to the November 2017 loan, which bears an electronic signature with his name. (*Id.* ¶ 72.) The loan documentation also includes an alleged promissory note and guaranty agreement for the full loan amount bearing Bilbo's electronic signature. (*Id.* ¶ 74.) Again, Bilbo does not recall seeing or signing either the promissory note or the guaranty agreement. (*Id.*) Bilbo, Inc. never received the $650,000 from Opes. (*Id.*)

Between 2017 and 2019, while Horton was managing Revolution's finances, he assured Bilbo that the Opes line of credit was "in good shape" and

that any remaining debt could be paid off when Bilbo sold Revolution. (*Id.*
¶ 79.) During this time, Wright and Horton assisted Bilbo in attempting to sell
or find investors for Revolution. (*Id.* ¶ 82.) Wright and Horton produced
multiple documents showing Revolution's financial projections, including
Revolution's debts and other liabilities; upon information and belief, the Opes
loans were not included in the documents provided to potential buyers. (*Id.*
¶¶ 83-84.) Prior to Revolution's sale, Bilbo repeatedly asked Wright and
Horton to give him the amount outstanding on his line of credit. (*Id.* ¶¶ 85-87.)
Eventually, Wright said that he thought the amount was around $400,000. (*Id.*
¶ 87.) After Revolution was acquired in January 2020, though, Wright told
Bilbo that he owed Opes approximately $3 million. (*Id.* ¶ 89.) Neither Wright
nor Horton provided documentation regarding any amounts outstanding to
Opes. (*Id.* ¶ 90-93.) Wright and Horton also did not disclose their affiliation
with Opes at this time. (*Id.* ¶ 94.)

In 2021, Wright and Horton sent Bilbo a summary showing that the
Revolution Parties owed Opes more than $7 million, including approximately
$1 million in principal, $2 million in interest, and $4 million in late fees (of 5
percent per month). (*Id.* ¶¶ 97-98.) The basis of this demand was a
consolidation loan that was allegedly executed on April 5, 2018. (*Id.* ¶ 99.)
According to the summary, the consolidation loan was in the amount of
$1,1000,000, bore an interest rate of 52 percent, and had a maturity date of
December 31, 2018. (*Id.* ¶ 100.) The Revolution Parties allege that neither

Bilbo, Revolution, nor Bilbo, Inc. entered into the consolidation loan and that they have never seen documentation to substantiate the loan's existence. (*Id.* ¶¶ 101-05.)

After receiving Opes' $7 million demand, counsel for the Revolution Parties began negotiating a resolution of the debt with counsel for Opes. (*Id.* ¶¶ 106-07.) This is when Bilbo allegedly first learned that Wright and Horton were affiliated with Opes—when Opes' counsel circulated a draft settlement agreement that included a liability release for Opes, Wright, Horton, and the Worth Entities. (*Id.* ¶ 108.) Bilbo refused to sign any settlement releasing all of the Opes Parties. (*Id.* ¶ 109-10.)

The Opes Parties then initiated this lawsuit against the Revolution Parties on September 22, 2022, alleging that the Revolution Parties breached the terms of their binding settlement agreement (even though Bilbo refused to formally execute the agreement). (Compl. ¶¶ 24-43.) In response, the Revolution Parties filed six counterclaims against various combinations of the Opes Parties—for fraudulent inducement, fraud, negligent misrepresentation, breach of fiduciary duty, constructive fraud, and civil conspiracy. (Answer ¶¶ 113-67.) Now the Opes Parties move this Court to dismiss all of the counterclaims under Federal Rule of Civil Procedure 12(b)(6).

## II.   Legal Standard

A motion to dismiss a counterclaim under Rule 12(b)(6) is evaluated under the same standard as a motion to dismiss a complaint. A complaint

6

should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, though, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that the plaintiff "receives the benefit of imagination" at the pleading stage). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of his claims and the grounds upon which they rest. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

### III.   Discussion

The Opes Parties raises three arguments in support of the motion to dismiss: (1) the counterclaims are foreclosed by the mutual release of liability in the alleged settlement agreement; (2) the Revolution Parties have not adequately pled the elements of their counterclaims under the Federal Rules

of Civil Procedure; and (3) the counterclaims are time-barred by the applicable four-year statute of limitations. The Court addresses each argument in turn.

## A. Whether the Counterclaims Are Barred by the Alleged Settlement Agreement

First, the Opes Parties argue that the Revolution Parties' counterclaims are barred by the liability release contained in the alleged settlement agreement. (Opes Parties' Br. in Supp. of Opes Parties' Mot. to Dismiss, at 11.) In response, the Revolution Parties contend that this argument is both procedurally improper—because the question of whether to enforce a settlement agreement should be analyzed under the framework for summary judgment—and factually incorrect—because the pleadings show that the parties never reached a meeting of the minds on all settlement terms. (Revolution Parties' Br. in Opp'n to Opes Parties' Mot. to Dismiss, at 10-11.)

There is no dispute that the alleged settlement agreement is governed by the Georgia law of contracts. To form a valid contract in Georgia, "there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. The sole element at issue on this motion is mutual assent. "In determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable person in the position of the other contracting party

8

would ascribe to the first party's manifestations of assent." *Extremity Healthcare, Inc. v. Access To Care Am., LLC*, 339 Ga. App. 246, 252 (2016) (citation omitted). Although parol evidence is not admissible to contradict or change the terms of a valid written agreement, a party can use parol evidence to prove or dispute the existence of an agreement. *See id.* at 254. That is, "the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence." *Hart v. Hart*, 297 Ga. 709, 711 (2015) (citation omitted).

The Opes Parties admit that the alleged settlement agreement was never executed as a signed, written document. (Opes Parties' Br. in Supp. of Opes Parties' Mot. to Dismiss, at 11.) Rather, they attempt to show mutual assent through the following series of events. First, on August 12, 2022, the Revolution Parties' counsel, Von DuBose, emailed the Opes Parties' counsel, Leron Rogers, a list of seven material settlement terms, to which Rogers responded: "These material terms are agreeable. My office will prepare a settlement agreement and related documents incorporating these terms." (Compl., Ex. A at 1-2.) When Rogers circulated the first draft of the settlement agreement, DuBose objected to the inclusion of a confession of judgment. (Compl. ¶ 20.) Rogers agreed to remove the provision and emailed DuBose a revised draft, stating: "Please circulate for signature if all is in order." (*Id.*, Ex. C-1 at 1.) DuBose confirmed receipt with the message: "Got it. I'll turn this

9

around." (*Id.,* Ex. D at 1.) At that point, Bilbo refused to sign the settlement agreement allegedly due to the liability release for all of the Opes Parties. (Compl. ¶ 22; Answer ¶ 109-10.)

The Court finds that these communications, standing alone, do not demonstrate as a matter of law the meeting of the minds necessary to form a binding contract. At most, the parties reached consensus on the general outline of a settlement deal, as reflected in the August 12, 2022 email exchange. When this general outline was translated into a full written agreement, the parties continued to negotiate its specific terms. For example, the Revolution Parties asked that the confession of judgment be struck from the first draft, and Bilbo was allegedly surprised to learn that the liability release included Wright, Horton, and the Worth Entities in addition to Opes. Indeed, the Opes Parties' counsel recognized the potential for more changes when he circulated the revised draft, requesting signatures "*if all is in order.*" The response from the Revolution Parties' counsel—that he would "turn this around"—cannot be considered an acceptance as a matter of law. *See, e.g., Oldham v. Self,* 279 Ga. App. 703, 705, 707-08 (2006) (finding no enforceable agreement where an attorney told opposing counsel, "I'm going to get it signed and get it back to you"). In sum, the Opes Parties' allegations and documents do not show a meeting of the minds with the Revolution Parties "at the same time, upon the same subject matter, and in the same sense." *S. Med. Corp. v. Liberty Mut. Ins. Co.,* 216 Ga. App. 289, 291 (1995). Therefore, the Court finds that the alleged

settlement agreement does not preclude the Revolution Parties' counterclaims.

**B.  Whether the Counterclaims Are Sufficiently Pled Under Rule 8(a) and 9(b)**

Next, the Opes Parties argue that the Revolution Parties failed to plead their counterclaims with sufficient particularity to survive dismissal. (Opes Parties' Br. in Supp. of Opes Parties' Mot. to Dismiss, at 14-19.) Four of the six counterclaims are based in fraud—fraudulent inducement (Count I), fraud (Count II), constructive fraud (Count V), and civil conspiracy (Count VI). Under Rule 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). To plead fraud with particularity, the complaint must set forth:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). In short, the factual allegations, accepted as true, must establish the who, what, when, where, and how of the fraud. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

First, according to the Opes Parties, the Revolution Parties cannot plausibly allege that Wright, Horton, and Opes concealed their affiliations with one another from Bilbo. (Opes Parties' Br. in Supp. of Opes Parties' Mot. to Dismiss, at 15.) In support, they attempt to introduce 15 exhibits showing that

11

Horton and Wright repeatedly emailed Bilbo in 2017 from an Opes email account and a Worth Advisors email account, respectively. (*Id.*, Exs. A-O.) But these exhibits were neither attached to nor cited in the Complaint or the Answer. Generally, a court must convert a motion to dismiss into a motion for summary judgment if it considers material outside the pleadings. *See Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018). There is an exception to this rule for documents attached to a motion to dismiss that are (1) referred to in the complaint, (2) central to the plaintiff's claim, and (3) undisputed. *See id.* Although the Opes Parties urge the Court to consider the email exhibits under this exception, they make no argument that the emails' contents are either referenced in the Answer or central to the Revolution Parties' counterclaims. (Opes Parties' Br. in Supp. of Opes Parties' Mot. to Dismiss, at 5 n.2.) It is not this Court's role to make arguments on behalf of the parties, so the Court declines to consider the exhibits attached to the motion to dismiss or to convert the motion into one for summary judgment.

The Opes Parties' next argument is more persuasive. To establish a cause of action for fraud, a plaintiff must show that he suffered actual damages, not merely nominal damages, as a result of the alleged fraud. *See Nash v. Studdard*, 294 Ga. App. 845, 848 (2008). Punitive damages are also available in tort actions but only where there is a valid claim for actual damages. *See id.* at 851. Here, the Opes Parties argue that the Revolution Parties improperly pled actual damages using bare legal conclusions rather

12

than specific facts. (Opes Parties' Br. in Supp. of Opes Parties' Mot. to Dismiss, at 15-16.) Citing Seventh Circuit case law, the Revolution Parties counter that Rule 9(b)'s particularity requirement does not apply to damages allegations, which are instead subject to notice pleading under Rule 8(a). (Revolution Parties' Br. in Opp'n to Opes Parties' Mot. to Dismiss, at 17-18.) The Revolution Parties also argue that their fraud counterclaims request a second form of relief—rescission—that is not tied to actual damages. (*Id.* at 18-19.)

As an initial matter, the Court need not decide whether Rule 9(b) or Rule 8(a) provides the standard for pleading damages on a fraud claim. Even under Rule 8(a)'s more liberal standard, the Revolution Parties have failed to allege any actual damages stemming from the Opes Parties' fraudulent conduct. As the Supreme Court has advised, notice pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level"; in other words, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570; *see also Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 960 (11th Cir. 2009) (citation and alteration omitted) ("At a minimum, notice pleading requires that a complaint contain inferential allegations from which we can identify each of the *material* elements necessary to sustain a recovery under some viable legal theory.").

In general, the Answer asserts that the Opes Parties fraudulently induced the Revolution Parties to enter into loans—and even fabricated loans—with exorbitant interest rates and late penalties. (*E.g.*, Answer ¶¶ 54-55, 58-59, 63, 71-74, 77, 97-101.) As of 2021, the Revolution Parties purportedly owed more than $7 million to the Opes Parties, including $2 million in interest and $4 million in late fees. (*Id.* ¶¶ 97-105.) But the Revolution Parties do not allege that they made any payments—whether principal, interest, or late payments—toward these loans. To the contrary, as the Court reads the Answer, there was an agreement among the parties to "square away" the debt once Revolution was sold to another agency. (*Id.* ¶ 87.) Following the sale, Wright and Horton (on behalf of Opes) demanded $3 million and then $7 million from the Revolution Parties. However, the Revolution Parties did not pay any amount toward these demands, nor do the Opes Parties seek to collect on these demands in this lawsuit. (*Id.* ¶¶ 89, 97, 106-10.) This case instead involves a later-negotiated settlement of the Revolution Parties' debt obligations. (Compl. ¶¶ 24-48.) The Revolution Parties have also made no payments toward the alleged settlement agreement.

Accordingly, the sole damages claimed by the Revolution Parties—their "payments" to the Opes Parties and the "fraudulent inflation" of their debt—are hypothetical, not actual. (Revolution Parties' Br. in Opp'n to Opes Parties' Mot. to Dismiss, at 21.) Indeed, the Revolution Parties insist that they are "*willing* to pay back funds they actually received, but what they are neither

willing nor required to do is pay inflated principal, interest, and late fees on loans that were fraudulently induced, never received, or deliberately concealed." (Revolution Parties' Br. in Opp'n to Opes Parties' Mot. to Dismiss, at 19 (emphasis added).) There has been no ascertainable injury, then, for which the Revolution Parties could be awarded compensation under their counterclaims. *See* O.C.G.A. § 51-12-4 ("Damages are given as compensation for injury; generally, such compensation is the measure of damages where an injury is of a character capable of being estimated in money."). For this reason, the Revolution Parties' reliance on *Get ME Mears, Inc. v. Cloud Performer, Inc.*, 2022 U.S. Dist. LEXIS 129293 (N.D. Ga. Jan. 5, 2022), is misplaced. There, the plaintiff at least alleged that it had paid "substantial sums" to the defendant. *Get ME Mears*, 2022 U.S. Dist. LEXIS 129293, at *20 (citation omitted). The same cannot be said for the Revolution Parties.

The Court also finds that the Revolution Parties' request to rescind the alleged loan agreements fails under Georgia law.

> In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud. *Where a party elects to rescind the contract, he must do so prior to filing the lawsuit.* And Georgia courts have long recognized that a tender to restore, or offer to restore, the consideration received is a condition precedent to filing a lawsuit for fraud in the inducement.

*Najarian Cap., LLC v. Clark*, 357 Ga. App. 685, 693 (2020) (citation omitted). While the Revolution Parties state in their brief that they are "willing" to

restore the consideration received from Opes, the Answer contains no allegation that they made such an offer before filing their counterclaims. Therefore, the Revolution Parties have affirmed the loan contracts (or at least those which are in fact valid contracts) and are left with the option to sue for damages from the alleged fraud—but not for rescission.

The same pleading defects sink the Revolution Parties' counterclaims for negligent misrepresentation (Count III) and breach of fiduciary duty (Count IV). To state a claim for negligent misrepresentation under Georgia law, the plaintiff must show "actual economic loss proximately resulting from [the defendant's] negligent misrepresentation." *Newitt v. First Union Nat'l Bank*, 270 Ga. App. 538, 546 (2004) (citation omitted). A claim for breach of fiduciary duty likewise requires allegations of "damage proximately caused by the breach." *Wade Park Land Holdings, LLC v. Kalikow*, 522 F. Supp. 3d 1341, 1356 (N.D. Ga. 2021) (citation omitted). As explained, there are no facts in the Answer from which the Court can surmise that the Revolution Parties suffered cognizable damages to support their counterclaims. Rather, the Revolution Parties repeatedly allege that they "have been damaged in an amount to be proven at trial." (Answer ¶¶ 141, 154.) Conclusory and unsupported statements like this fall short of plausibly alleging actual damages. *See Lakeview Loan Servicing, LLC v. Mobley*, 2019 WL 3502914, at *6 (N.D. Ga. June 4, 2019).

Accordingly, all of the Revolution Parties' counterclaims should be dismissed for failure to plead damages in accordance with the Federal Rules of Civil Procedure. The Court will afford the Revolution Parties one opportunity to amend their counterclaims within 14 days of the date of this Order if they know of additional facts that would resolve the Answer's deficiencies. *See Garcia v. Chiquita Brands Int'l, Inc.*, 48 F.4th 1202, 1220 (11th Cir. 2022) ("Generally, where a more carefully drafted complaint might state a claim, a plaintiff must be given *at least one* chance to amend the complaint before the district court dismisses the action with prejudice." (citation omitted)).

## C. Whether the Counterclaims Are Time-Barred by the Applicable Statutes of Limitations

Finally, the Opes Parties argue that the counterclaims all accrued in 2017—when the allegedly fraudulent loan agreements were executed—and thus are barred by the four-year statute of limitations. (Opes Parties' Br. in Supp. of Opes Parties' Mot. to Dismiss, at 20-21.) This argument is wrong for at least two reasons. First, it relies on the same inadmissible exhibits described above to show that the Revolution Parties should have "discovered" the fraud (i.e., the Opes Parties' affiliations with one another) in 2017. (*Id.* at 21.) Second, it assumes that the Revolution Parties' allegations of fraud are limited to the execution of the 2017 loan agreements. In fact, the Revolution Parties point to other potentially actionable misrepresentations and omissions within the four-year limitations period—for example, Wright and Horton's practice of

making credit card advances to Revolution and their efforts to conceal the amount of debt on which the Revolution Parties were accruing interest and late penalties. (Answer ¶¶ 77-79, 82-87.) Accordingly, the Court determines that the statute of limitations does not preclude the Revolution Parties' counterclaims.

## IV.   Conclusion

For the foregoing reasons, the Plaintiffs' Motion to Dismiss Defendants' Counterclaims [Doc. 25] is GRANTED in part and DENIED in part. The Court GRANTS the Defendants leave to amend their counterclaims within 14 days of the date of this Order to correct the pleading deficiencies identified herein.

SO ORDERED, this ___4th___ day of April, 2023.

THOMAS W. THRASH, JR.
United States District Judge

18